IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

LISA ANNE CLARK,                    )
                                    )
        Plaintiff,                  )
                                    )
    v.                              )       Case No.
                                    )       11-6029-CV-SJ-REL-SSA
MICHAEL J. ASTRUE, Commissioner     )
of Social Security,                 )
                                    )
        Defendant.                  )

<u>ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>

Plaintiff Lisa Anne Clark seeks review of the final decision of the Commissioner of

Social Security denying plaintiff's application for disability benefits under Titles II and XVI of

the Social Security Act ("the Act").  Plaintiff argues that the ALJ erred in finding plaintiff not

credible.  I conclude that the substantial evidence in the record as a whole supports the ALJ's

finding that plaintiff is not disabled.  Therefore, plaintiff's motion for summary judgment will

be denied and the decision of the Commissioner will be affirmed.

I.      BACKGROUND

On April 16, 2008, plaintiff applied for disability benefits alleging that she had been

disabled since August 3, 2007.  Plaintiff's disability stems from degenerative joint disease of the

right knee, fibromyalgia, migraine headaches, bipolar disorder, and depression.  Plaintiff's

application was denied on June 2, 2008.  On November 17, 2009, a hearing was held before

an Administrative Law Judge.  On January 22, 2010, the ALJ found that plaintiff was not under

a "disability" as defined in the Act.  On February 3, 2011, the Appeals Council denied

plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of

the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental

2

impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1. Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

3

## IV. THE RECORD

The record consists of the testimony of plaintiff and vocational expert Amy Salva, in addition to documentary evidence admitted at the hearing.

### A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

The record establishes that plaintiff earned the following income from 1979 through 2009:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1979 | $ 87.58 | 1995 | $ 11,046.79 |
| 1980 | 2,012.77 | 1996 | 10,563.44 |
| 1981 | 2,759.26 | 1997 | 10,850.42 |
| 1982 | 3,171.20 | 1998 | 10,104.39 |
| 1983 | 2,327.78 | 1999 | 10,600.02 |
| 1984 | 4,201.69 | 2000 | 12,965.52 |
| 1985 | 5,493.06 | 2001 | 15,915.64 |
| 1986 | 2,156.53 | 2002 | 17,061.08 |
| 1987 | 3,367.71 | 2003 | 17,950.09 |
| 1988 | 3,521.53 | 2004 | 17,978.11 |
| 1989 | 10,219.02 | 2005 | 18,515.75 |
| 1990 | 9,150.39 | 2006 | 19,369.44 |
| 1991 | 6,969.32 | 2007 | 12,655.94 |

| 1992 | 10,082.86 | 2008 | 2,672.41 |
|------|-----------|------|----------|
| 1993 | 6,578.00 | 2009 | 0.00 |
| 1994 | 11,492.12 | | |

(Tr. at 138-148).

Plaintiff collected unemployment benefits in the fourth quarter of 2007 and the first quarter of 2008 (Tr. at 148).

## Missouri Supplemental Questionnaire

In a Missouri Supplemental Questionnaire dated April 24, 2008, plaintiff reported that she experiences drowsiness and dizziness from Flexeril (muscle relaxer), Ultram (an optiate agonist used to treat moderate to moderately severe pain) and Topamax (used to prevent, but not treat, migraine headaches) (Tr. at 175). She lives by herself and is able to do laundry, do dishes using a dishwasher, made beds, change sheets, iron, take out the trash, do her own banking, and go to the post office (Tr. at 175, 177). She can shop for 30 minutes at a time (Tr. at 177). Although she reported that she does not cook, that her meals are brought in, she also indicated that there have been no changes in her meal preparation, cooking, or use of utensils as a result of her impairments (Tr. at 177). Plaintiff is able to drive, goes out about once a week about five to ten miles, and typically stays out of her home for an hour or two once a week (Tr. at 179). She indicated that her body is so sore it hurts for anyone to touch her (Tr. at 180). "My ANA test[1] is always positive." (Tr. at 180). She stated that she cannot afford to go to

---

[1]An ANA test detects antinuclear antibodies in the blood. The immune system normally makes antibodies to help fight infection. In contrast, antinuclear antibodies often attack the body's own tissues -- specifically targeting each cell's nucleus. In most cases, a positive ANA test indicates that the immune system has launched a misdirected attack on the body's own tissue -- in other words, an autoimmune reaction. But some people have positive ANA tests even when they are healthy. A doctor may order an ANA test if he suspects his patient has an autoimmune disease such as lupus, rheumatoid arthritis or scleroderma. Many rheumatic diseases have similar signs and symptoms -- joint pain, fatigue and fever. While an ANA test

5

the doctor because she does not have insurance (Tr. at 180).

## Function Report

In a Function Report dated April 26, 2009, plaintiff reported that she spends her day as follows: "Have coffee, shower, dress, talk on phone, watch TV, late afternoon eat, read, TV, bath, go to bed. This is on a day I am not in severe pain. Most days I am in bed most of the days & I shower & family brings my meals to me if I can keep anything down." (Tr. at 201). Plaintiff reported that she has a hard time lifting a bottle of shampoo or conditioner in the shower because of her arms. She has difficulty holding a hair dryer or curling iron, and she sometimes has difficulty bending to shave her legs (Tr. at 202).

## Activities of Daily Living Questionnaire

In a report entitled Activities of Daily Living, dated October 4, 2009, plaintiff reported that her condition does not affect her ability to care for her personal needs such as bathing, grooming, dressing, etc. (Tr. at 237). Plaintiff reported that she does her own laundry and that she sometimes needs help with carrying and folding (Tr. at 238). Plaintiff drives and is able to watch television for "a few hours" (Tr. at 239). She spends 30 minutes to an hour reading the newspaper (Tr. at 240). Plaintiff is able to visit on the telephone and has no difficulty with this (Tr. at 241). Plaintiff sleeps for eight to ten hours each night, and she naps for two to three hours each day (Tr. at 241). Plaintiff indicated that she completed the six-page form in her own handwriting (Tr. at 241). Plaintiff stated that water exercise made her joints and muscles feel somewhat better (Tr. at 242).

---

cannot confirm a specific diagnosis, it can rule out some possible diseases. If the ANA test is positive, the patient's blood can be tested for the presence of particular antinuclear antibodies, some of which are specific to certain diseases.

B.    *SUMMARY OF MEDICAL RECORDS*

August 3, 2007, is plaintiff's alleged onset date.

On August 1, August 18, August 31, September 28, and October 5, 2007, and March 1, 2008, plaintiff saw Marilyn Fitzgerald, RN, at the Samaritan Counseling Center, for therapy (Tr. at 369-372).  These treatment notes are mostly illegible.

On August 6, 2007, plaintiff saw Ellis Berkowitz, M.D., of Internal Medicine Associates, who noted that plaintiff had not sought treatment at his office in two years and had experienced no serious medical problems during that time (Tr. at 250).  However, on this date plaintiff complained of increasing discomfort in her hands and right knee (Tr. at 250).  She had recently lost her job and was "unclear as to why that happened" (Tr. at 250).  She reported that insomnia was "a bit of an issue," and she had chronic fibromyalgia symptoms that had worsened (Tr. at 250).  Physical examination was normal, except that plaintiff's right knee had significant bony crepitus[2] (Tr. at 250).  She had good grip strength, no obvious changes in her hands, and good range of motion in the wrists with no swelling (Tr. at 250).  Dr. Berkowitz's impression was fibromyalgia, for which he encouraged "as always," a progressive walking program; insomnia; degenerative arthritis in the right knee; and arthralgias (severe pain in a joint) (Tr. at 251).  Laboratory testing indicated high cholesterol, negative antinuclear antibody (ANA), and normal rheumatoid factor (Tr. at 251, 253).

On August 8, 2007, plaintiff saw C. Daniel Smith, D.O., of the Orthopedic and Sports Medicine Center (Tr. at 266).  She reported a six-year history of persistent right knee pain in a peripatellar fashion, i.e., around the kneecap, that was moderate in intensity (Tr. at 266).  Dr. Smith noted that plaintiff had normal mood and affect (Tr. at 266).  Examination revealed

---

[2]A clinical sign in medicine characterized by a peculiar crackling, crinkly, or grating feeling or sound in the joints.  Crepitus in a joint can represent cartilage wear in the joint space.

patellofemoral crepitus[3] but intact ligaments (Tr. at 266). Lachman's test, pivot shift, drawer signs, and McMurray's test were all normal (Tr. at 266). X-rays were normal (Tr. at 266). Dr. Smith assessed chondromalacia patella[4] and ordered magnetic resonance imaging (MRI) to see if plaintiff might be a candidate for arthroscopy[5] (Tr. at 266).

On August 15, 2007, plaintiff saw Dr. Smith to discuss the MRI, which the physician noted was normal (Tr. at 263, 265). Plaintiff was doing better, and Dr. Smith indicated that her knee pain may resolve on its own (Tr. at 263).

On August 13, 2007, plaintiff saw K. Kwas Huston, M.D., at the Center for Rheumatic Disease and the Center for Allergy and Immunology (Tr. at 255-57). Plaintiff reported a recent increase in discomfort in her right knee, hands, and ankles and episodes of stiffness and achiness; she was concerned about the possible development of scleroderma[6] (Tr. at 255). She had no redness, warmth, or swelling, no symptoms of Raynaud's phenomenon,[7] and no

---

[3]A crackling sound in the knee joint, i.e., the are of the patella and the femur.

[4]Chondromalacia patella is the softening and breakdown of the tissue (cartilage) that lines the underside of the kneecap (patella).

[5]In an arthroscopic examination, an orthopaedic surgeon makes a small incision in the patient's skin and then inserts pencil-sized instruments that contain a small lens and lighting system to magnify and illuminate the structures inside the joint. Light is transmitted through fiber optics to the end of the arthroscope that is inserted into the joint. By attaching the arthroscope to a miniature television camera, the surgeon is able to see the interior of the joint through this very small incision rather than a large incision needed for surgery. The television camera attached to the arthroscope displays the image of the joint on a television screen, allowing the surgeon to look throughout the knee. This lets the surgeon see the cartilage, ligaments, and under the kneecap. The surgeon can determine the amount or type of injury and then repair or correct the problem, if it is necessary.

[6]Scleroderma is a connective tissue disease that involves changes in the skin, blood vessels, muscles, and internal organs. It is a type of autoimmune disorder, a condition that occurs when the immune system mistakenly attacks and destroys healthy body tissue.

[7]Raynaud's phenomenon is a condition in which cold temperatures or strong emotions cause blood vessel spasms that block blood flow to the fingers, toes, ears, and nose.

8

significant morning stiffness (Tr. at 255). Examination revealed full range of motion and strength in the upper and lower extremities, diffuse fibromyalgia tender points, and no synovitis[8] or joint effusions[9] (Tr. at 256). Dr. Huston noted that plaintiff was "laid off from her job as a banker recently" (Tr. at 256). Dr. Huston ordered laboratory testing, which indicated a negative ANA, and recommended continued treatment for fibromyalgia, noting that plaintiff "seems to be doing well with Flexeril," a muscle relaxer (Tr. at 256, 259). He advised an exercise program (Tr. at 256).

On December 17, 2007, plaintiff saw Ms. Fitzgerald at the Samaritan Counseling Center, who assessed no change in diagnosis, prescribed Seroquel (treats schizophrenia) and Zoloft (treats depression), and discontinued Abilify (treats schizophrenia) due to side effects (Tr. at 282). A mental status examination was normal but for depressed mood (Tr. at 282).

On March 27, 2008, Ms. Fitzgerald noted in a letter that plaintiff had "an extreme case of Fibromyalgia and Migraine headaches" and was unable to continue working as a teller because she was not permitted to sit while working (Tr. at 283). Ms. Fitzgerald noted that pain, swelling, and migraine headaches also affected plaintiff's mental health (Tr. at 283).

On April 10, 2008, plaintiff saw Ms. Fitzgerald, who noted no medication side effects and a normal mental status examination, but for depressed mood (Tr. at 284). Ms. Fitzgerald did not indicate a diagnosis, but increased the dosage of Zoloft (Tr. at 294).

---

[8]In certain situations, the synovium (the lining of the joints) may become thickened and inflamed. Normally only a few cell layers thick, the synovium can become thickened, more cellular, and engorged with fluid in the condition called synovitis. Most commonly seen in arthritic conditions, and most pronounced in rheumatoid arthritis, synovitis can cause pain and inflammation within the affected joint.

[9]Also known as "water on the knee" -- A small amount of fluid exists in normal joints. When a joint is affected by arthritis, particularly an inflammatory arthritis such as rheumatoid arthritis, increased abnormal amounts of fluid build up, the knee appears swollen. The fluid is produced by the tissues that are affected by the arthritis and that line the joint.

On May 1, 2008, plaintiff saw Ms. Fitzgerald, reporting that the Zoloft increase had helped, but she had pain in her hands, arms, and feet, and could not do any work without sitting (Tr. at 285). The mental status examination was normal but for depressed and anxious mood (Tr. at 285). Ms. Fitzgerald assessed bipolar disorder[10] and a GAF of 43[11] (Tr. at 285).

On May 12, 2008, Ms. Fitzgerald noted in a letter that plaintiff had been treated at the Samaritan Counseling Center since October 2, 2002, and her current diagnosis was bipolar disorder and major recurrent depression, with a GAF of 43 (Tr. at 286). Ms. Fitzgerald noted that plaintiff had "tried several mood stabilizers with major side effects caused by each one of them," including a rash with Lamictal [treats bipolar disorder], increased blood sugar and triglycerides with Seroquel [treats schizophrenia], and swelling of the hands, feet, face, and joint stiffness with Abilify [treats schizophrenia]" (Tr. at 286). Ms. Fitzgerald noted that plaintiff's current medications, prescribed by her and Dr. John Cox, were Zoloft, Topamax, Flexeril, and Ultram (Tr. at 286). She noted that plaintiff could not work due to physical pain and mood stabilization condition (Tr. at 286).

On July 7, 2008, plaintiff saw Ms. Fitzgerald, who noted that plaintiff had no side effects of medications, and a mental status examination was normal but for depressed mood

---

[10]Bipolar disorder is a condition in which people go back and forth between periods of a very good or irritable mood and depression. The "mood swings" between mania and depression can be very quick. People with bipolar disorder type I have had at least one manic episode and periods of major depression. In the past, bipolar disorder type I was called manic depression. People with bipolar disorder type II have never had full mania. Instead they experience periods of high energy levels and impulsiveness that are not as extreme as mania (called hypomania). These periods alternate with episodes of depression.

[11]A global assessment of functioning of 41 to 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

(Tr. at 287).  Ms. Fitzgerald did not make an assessment, but prescribed Zoloft and Seroquel
(Tr. at 287).

On October 23, 2008, plaintiff saw Ms. Fitzgerald, noting that her depression was
better, but she had medication side effects (Tr. at 288).  A mental status examination was
normal but for depressed mood (Tr. at 288).  Ms. Fitzgerald noted no change in assessment,
and she prescribed medications including Seroquel (Tr. at 288).

On November 18, 2008, plaintiff saw Ms. Fitzgerald, who indicated that plaintiff had
no medication side effects and her mood was stable (Tr. at 289).  The mental status
examination was normal (Tr. at 289).  The assessment was unchanged and Ms. Fitzgerald
prescribed medications including Zoloft and Seroquel (Tr. at 289).

On May 30, 2008, State agency medical consultant Joan Singer, Ph.D., completed a
Psychiatric Review Technique form, indicating that plaintiff had bipolar disorder, but did not
meet or equal a listing (Tr. at 271-281).  Dr. Singer noted that plaintiff had mild restrictions in
activities of daily living; moderate restrictions in social functioning; moderate restrictions in
concentration, persistence, and pace; and no repeated episodes of decompensation of extended
duration (Tr. at 279).  Dr. Singer also completed a mental residual functional capacity ("RFC")
assessment on May 30, 2008 (Tr. at 268-270).  She indicated that plaintiff had moderate
limitations in the ability to work in coordination with or proximity to others without being
distracted by them, complete a normal workday and workweek without interruptions from
psychologically based symptoms, perform at a consistent pace without an unreasonable
number and length of rest periods, accept instructions and respond appropriately to criticism
from supervisors, and respond appropriately to changes in the work setting (Tr. at 268-269).
She found that plaintiff had no other significant limitations (Tr. at 268-269).

11

On December 3, 2008, plaintiff saw Dr. Berkowitz for fibromyalgia, urinary incontinence, and bleeding hemorrhoids (Tr. at 296-97). She reported no pain (Tr. at 296-97). A physical examination was normal except for hemorrhoids (Tr. at 296). Dr. Berkowitz increased plaintiff's dosage of Topamax, Zoloft, and Ultram, kept her on Flexeril, and added Zyprexa (treats schizophrenia) (Tr. at 297).

On February 10, 2009, plaintiff saw Dr. Berkowitz, complaining of bilateral arm pain that she attributed to Crestor (reduces cholesterol) as well as bilateral hand numbness (Tr. at 292-93). Plaintiff reported pain at a nine or ten out of ten (Tr. at 292-293). Physical examination was normal, with no inflammation, swelling, or tenderness involving plaintiff's ankles, calves, knees, thighs, fingers, or wrists, although she had "some minimal, if at all, tenderness" in her arms (Tr. at 292). Dr. Berkowitz discontinued Crestor for hyperlipidemia, and assessed arm arthralgias (severe pain in a joint), myalgias (muscle pain), and fibromyalgia (Tr. at 292).

On March 2, 2009, plaintiff saw Umar Daud, M.D., of Heartland Arthritis and Osteoporosis Center, for consultation regarding aches and pains (Tr. at 301-305). Plaintiff reported pain at a ten out of ten, fatigue and depression at a five out of ten, anxiety and sleep problems at a three out of ten, and gastrointestinal issues at a one out of ten (Tr. at 301). Plaintiff reported that she was diagnosed with fibromyalgia in 2001 and had a positive ANA (Tr. at 301). Most of her pain was in the muscles of her hands, but she reported "some elbow pain" and difficulty picking up objects, which was new (Tr. at 302). She also reported swelling, redness, and warmth of the small joints of the hands, morning stiffness lasting from a few minutes to a few hours, and was experiencing "new and different" pain (Tr. at 302).

A physical examination was normal but for tenderness over multiple joints (Tr. at 304). Dr. Daud assessed a history of positive ANA, arthralgias, myalgias, and weakness, complicated

12

by a history of depression, bipolar, chronic headache, and sinusitis (Tr. at 304). He noted that plaintiff seemed to have developed chronic pain syndrome, but this was a diagnosis of exclusion, so he planned to evaluate her for inflammatory arthritis and connective tissue disease (Tr. at 305). He ordered laboratory testing and recommended Lyrica (treats nerve pain and fibromyalgia) in addition to plaintiff's other psychiatric medications, but asked plaintiff to discuss this with her psychiatrist (Tr. at 305). He also recommended water therapy, weight loss, and exercise (Tr. at 305).

On April 1, 2009, plaintiff saw Dr. Daud for follow-up, reporting symptoms of increased aches and pains, fatigue, bilateral elbow pain, and morning stiffness (Tr. at 311-16). Dr. Daud noted that plaintiff had fibromyalgia (Tr. at 312). Physical examination was normal, except plaintiff had tenderness over multiple joints and the bilateral epidcondyles,[12] and diffuse tender points (Tr. at 313). Plaintiff had good range of motion in all her joints and normal muscle strength (Tr. at 313). She was reasonable, with normal memory, mood, and judgment, and was fully oriented (Tr. at 313-314). Dr. Daud indicated that plaintiff had a "mildly positive" ANA with a negative profile, a history of fibromyalgia, and bilateral epicondylar pain, complicated by a history of depression, bipolar illness, chronic headaches, and sinusitis (Tr. at 314, 316). He recommended over-the-counter ibuprofen and elbow splints for the bilateral epicondylitis, and water therapy for fibromyalgia (Tr. at 314). He noted that plaintiff was "on good treatment for fibromyalgia" and recommended plaintiff follow up with her primary care provider (Tr. at 314, 316).

In response to a letter from plaintiff's attorney on April 29, 2009, Dr. Berkowitz declined to give an opinion regarding plaintiff's RFC (Tr. at 429).

_____

[12]A rounded projection at the end of a bone, located on or above a condyle and usually serving as a place of attachment for ligaments and muscles.

On June 2, 2009, plaintiff saw S.R. Davuluri, M.D., at Heartland Neurology for evaluation of headaches (Tr. at 321-325). Plaintiff reported five to six "bad" headaches per month, with nausea and photophobia (Tr. at 321). She had been on Topamax since 1998 (Tr. at 321). She also reported bladder dysfunction, fibromyalgia, and difficulty sleeping (Tr. at 321, 323). Dr. Davuluri noted no functional impairment in daily living (Tr. at 323). Examination revealed that plaintiff was in no acute distress, fully oriented, with normal speech, cranial nerve function, muscle tone and strength, gait and ambulation, and sensory perception (Tr. at 324-325). Examination was unremarkable, but plaintiff appeared to have a combination of migraine and rebound headaches[13] (Tr. at 325). Dr. Davuluri diagnosed common migraine, ordered an MRI and laboratory testing, and advised that plaintiff follow up in six weeks (Tr. at 325). He prescribed Depakote and advised that plaintiff stop taking over-the-counter migraine medication (Tr. at 325).

On June 2, 2009, Ms. Fitzgerald completed a mental RFC questionnaire (Tr. at 343-347). She noted that she began treating plaintiff with cognitive behavioral therapy on October 24, 2002, after the death of her husband (Tr. at 343). Ms. Fitzgerald noted that plaintiff's mood was stable, but she complained of constant headaches and physical pain (Tr. at 343). Providers with her office prescribed Sertraline (Zoloft, an antidepressant), Seroquel (treats schizophrenia), Topamax (prevents migraine headaches), Flexeril (muscle relaxer), and Ultram (pain reliever) for plaintiff, which caused side effects including drowsiness, fatigue, weight gain, and confusion (Tr. at 343). Ms. Fitzgerald noted that, without therapy and medication, plaintiff had periods when she stayed at home in bed, followed by an inability to control her urges and erratic behaviors due to bipolar disorder (Tr. at 343). She noted that

---

[13]Also known as "medication overuse headaches".

14

plaintiff's condition was controllable "to a point," and that chronic pain magnified plaintiff's psychological symptoms (Tr. at 343). Ms. Fitzgerald noted that those symptoms included decreased energy, appetite disturbance, emotional lability, flight of ideas, manic syndrome, mood disturbance, difficulty thinking or concentrating, recurrent and intrusive recollections of a traumatic experience, sleep disturbance, occasional isolation or emotional withdrawal, and bipolar syndrome (Tr. at 344).

Ms. Fitzgerald opined that plaintiff was seriously limited, but not precluded, in the ability to sustain an ordinary routine without special supervision and the ability to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes (Tr. at 345). She found that plaintiff was unable to meet competitive standards with regard to her ability to:

- ❏ maintain regular attendance and be punctual within customary tolerances
- ❏ complete a normal workday and workweek without interruption from psychologically based symptoms
- ❏ respond appropriately to changes in a routine work setting
- ❏ deal with stress of semiskilled and skilled work
- ❏ travel in unfamiliar places
- ❏ use public transportation

(Tr. at 345-346).

Ms. Fitzgerald indicated that plaintiff had no useful ability to perform at a consistent pace without unreasonable breaks or to deal with normal work stress (Tr. at 345). Plaintiff's abilities were otherwise unlimited or satisfactory (Tr. at 345-346). Ms. Fitzgerald found that plaintiff would likely miss more than four days of work per month and pain made it difficult for plaintiff to be in one position (Tr. at 347).

15

On June 4, 2009, plaintiff saw Matthew T. Robinson, M.D., at the Heartland Regional Medical Center Emergency Room for a "moderately severe" headache with nausea and vomiting that had lasted 20 hours (Tr. at 333-39). The physician diagnosed migraine and prescribed Phenergan for nausea (Tr. at 336).

On July 8, 2009, State agency psychological consultant Richard Kaspar, Ph.D., reviewed the evidence of record and affirmed the findings of Dr. Singer dated May 30, 2008 (Tr. at 340).

On July 17, 2009, State agency medical consultant Robert Hughes, M.D., reviewed the evidence of record and completed a physical RFC assessment, indicating that plaintiff could lift and carry 20 pounds occasionally and ten pounds frequently and stand, sit, and walk about six hours each in an eight-hour workday (Tr. at 360).

On July 28, 2009, plaintiff saw Dr. Davuluri, reporting continued headaches (Tr. at 326). She continued to take Excedrin migraine and was not taking Depakote because of weight gain (Tr. at 326). Plaintiff stated that she had about five headaches per month, the worst one lasting six days, with blurred vision and pain in her chest and abdomen (Tr. at 326). An MRI was normal (Tr. at 326). Plaintiff was in no acute distress, and an examination was unremarkable (Tr. at 329-30). Dr. Davuluri diagnosed common migraine and prescribed Verapramil (treats high blood pressure and chest pain) and Treximet (treats migraine headaches) (Tr. at 330).

Also on July 28, 2009, Dr. Davuluri completed a "Headaches Residual Functional Capacity Questionnnaire" (Tr. at 221-226). He stated that he had treated plaintiff since June 2, 2009, for migraine headaches that occurred five to six times per month,[14] lasting several

_____

[14]Dr. Davuluri's medical records do not show visits by plaintiff five or six times per month; therefore, this report was based on something other than his medical records.

16

hours up to seven days (Tr. at 221-222). Associated symptoms included nausea, vomiting, photosensitivity, and mood changes (Tr. at 222). Dr. Davuluri noted that lack of sleep, noise, stress, and weather changes triggered plaintiff's headaches, that they worsened with bright lights, noise, and movement, and improved with lying in a dark room (Tr. at 222-223). Dr. Davuluri noted no positive test results or objective medical findings in support of his opinion (Tr. at 223). He indicated that plaintiff was not a malingerer, that emotional factors contributed somewhat to her headaches, and that her impairments were reasonably consistent with the symptoms and functional limitations described (Tr. at 223). Plaintiff was taking Verapramil and Treximet for headaches and these caused low blood pressure and light headaches (Tr. at 224). Dr. Davuluri stated that plaintiff's prognosis was poor; she would generally be precluded from performing basic work activities; and she would need unscheduled breaks several times per month, lasting up to several days (Tr. at 224).

On September 6, 2009, plaintiff saw Douglas Goodman, M.D., at the Heartland Regional Medical Center Emergency Room (Tr. at 403). The physician diagnosed low blood pressure and noted that it was caused by Verapramil (Tr. at 397).

On September 9, 2009, plaintiff saw Dr. Berkowitz and had stopped Verapramil (Tr. at 404). Dr. Berkowitz discontinued Lyrica (treats nerve pain) and prescribed Enablex (treats overactive bladder) and Treximet (treats acute migraine headaches) (Tr. at 404). Plaintiff reported no pain (Tr. at 404).

The following records were submitted to the Appeals Council after the ALJ's denial of plaintiff's application.

On January 3, 2010, plaintiff saw Frances Dea Flynt, NP, at the Heartland Regional Medical Center Emergency Room, complaining of ear pain, headache, nausea, vomiting, and a

Case 5:11-cv-06029-REL   Document 12   Filed 02/14/12   Page 17 of 31

sore throat since the day before (Tr. at 431-33). Her condition resolved and she was discharged that day (Tr. at 433).

On March 15, 2010, plaintiff saw Rebecca L. Roberts, D.O., at the Heartland Regional Medical Center Emergency Room, reporting a migraine that had lasted five days (Tr. at 436). Examination indicated plaintiff was in moderate distress, and she was diagnosed with migraine headache, prescribed medication, and discharged home in improved and stable condition (Tr. at 437).

On March 16, 2010, plaintiff saw Toby E. Miller, APN, at the Heartland Regional Medical Center Emergency Room and reported that her headache had persisted without improvement (Tr. at 439-40). She stated that this was a "typical migraine for her" (Tr. at 440). She was discharged home in improved and stable condition that day (Tr. at 441).

## C. SUMMARY OF TESTIMONY

During the November 17, 2009, hearing, plaintiff testified; and Amy Salva, a vocational expert, testified at the request of the ALJ.

### 1. Plaintiff's testimony.

At the time of the hearing, plaintiff was 45 years old and is currently 48 (Tr. at 40). She lived alone in a house with a basement (Tr. at 41). She is a widow and has no children (Tr. at 41). She hires someone to do her yard work (Tr. at 66).

Plaintiff is 5' 8 ½" tall and at the time of the hearing weighed 140 pounds (Tr. at 41). Plaintiff has 14 ½ years of education (Tr. at 42). She has a valid driver's license and drives once or twice a week (Tr. at 42). She shops for groceries every two or three months; otherwise, her mother brings groceries for her (Tr. at 42). Plaintiff's income consists of $621 per month (Tr. at 42).

Plaintiff was asked when she last worked, and she said it was in August 2007 (Tr. at 42). The ALJ then indicated that her earnings record showed she worked at Nodaway Valley Bank in January 2008 (Tr. at 43). Plaintiff said, "I worked there for a very short time. I was not able to handle the work. It was just like a couple weeks or so." (Tr. at 43). Plaintiff then testified she also worked at North American Savings for a very short time during 2008 (Tr. at 43).

Plaintiff suffers from migraine headaches (Tr. at 44). She went on Topamax in 1998 and then went on Imitrex in 2000 but was also kept on the Topamax (Tr. at 44). Plaintiff said she takes Treximet, which came out after Imitrex (treats migraine headaches), and she takes that and Topamax back and forth (Tr. at 44). The Treximet, which she began taking in September 2009, "helped some" (Tr. at 45). She used to have about four headaches a month, but since 2008 she now has six or seven a month and they last from three days to six or seven days (Tr. at 53). She vomits with headaches and has to take medication for nausea (Tr. at 53). Plaintiff explained that Topamax is a preventative medicine and Treximet is what she takes when she has a headache (Tr. at 53). Plaintiff said she had an MRI of her head that came back normal (Tr. at 55). Plaintiff had some other studies done on her head in the late 1990s and she was told that the lower left lobe of her brain showed hardly any color (Tr. at 55-56).

Plaintiff suffers from bipolar disorder and takes Zyprexa, Zoloft, and Seroquel (Tr. at 45-46). She is "down" more often than she is manic (Tr. at 51). She very seldom has the high peaks (Tr. at 51). Plaintiff takes Ultram, Lyrica, and Flexeril but is still in daily pain (Tr. at 47). Those drugs help to some extent, however (Tr. at 47).

Plaintiff's fingers are painful, swell, go numb, and lock up (Tr. at 48). She has severe pain in her arms (Tr. at 49). She has pain and swelling in her feet and toes (Tr. at 49). Dr. Kimpton told her in 2001 to stay off her feet and elevate them (Tr. at 49). Plaintiff said her

ANA tests always come back positive; however, the ALJ noted that an ANA test from St. Luke's in August 2007 was negative[15] (Tr. at 49). Plaintiff's doctor has recommended she do water therapy; however, she is not able to do that because of her headaches (Tr. at 66). She did water therapy for a while, and when she did it helped her fibromyalgia "some" (Tr. at 67).

During plaintiff's testimony she was asked whether she was in pain; she said her arms, feet, right knee and head were hurting (Tr. at 56). On a scale of 1 to 10 with 10 being pain she cannot endure, she testified that her arms were a 9 during the hearing, her feet were an 8, her knee was a 9, and her head was a 7 (Tr. at 56-57). She had taken Ultram that day (Tr. at 57). This level of pain is fairly typical despite her medications (Tr. at 57).

Plaintiff could not lift a 12-pack of soda from a table and put it on the floor because "half the time" her hands go numb (Tr. at 57). She can grip a cup of coffee or one soda (Tr. at 57-58). She can use small objects like a pen or pencil (Tr. at 58). She can reach into a cabinet to get a can of soup (Tr. at 58). She could bend over and pick up keys off the floor (Tr. at 58). She could get down on the floor to look for her keys if she could not find them (Tr. at 58). She can climb the stairs in her house if necessary (Tr. at 58). Some days she is dizzy and her balance is off so she falls into things (Tr. at 58). Heat, cold, and chemical smells will send her to the doctor (Tr. at 59). Plaintiff smokes a half a pack of cigarettes per day (Tr. at 59). She could walk a couple of blocks if necessary (Tr. at 59). Plaintiff is able to do no housework at all (Tr. at 59-60). She does no cooking and she does no dishes -- her mother does all of that for her (Tr. at 60). She said she sees her mother about every other day (Tr. at 60). When asked whether she does not eat on the days she does not see her mother, plaintiff said she

---

[15]In fact the record shows two negative ANA tests and "mildly positive" ANA test.

actually could make things in the microwave (Tr. at 60). She goes to restaurants occasionally (Tr. at 60).

Plaintiff has trouble going to sleep, so she normally sleeps from about 3:00 or 4:00 a.m. until around noon (Tr. at 61). She takes a shower, watches television, talks to her friends on the phone, goes to appointments, and visits with friends when they come over (Tr. at 61). Plaintiff takes Amitryptiline (antidepressant) and Flexeril (muscle relaxer) to help her sleep (Tr. at 61). They help some (Tr. at 62). Plaintiff has problems concentrating and remembering because of the fibromyalgia -- it puts her in a fog (Tr. at 62). On bad days plaintiff stays in bed all day in a dark quiet room (Tr. at 65). She uses ice packs and is "pretty well incapacitated" (Tr. at 65). Bad days consist of having a migraine headache or depression (Tr. at 65).

Plaintiff's medication causes dizziness, drowsiness, depression, nausea, fatigue, blurred vision, and weight gain (Tr. at 62-63). The ALJ noted that plaintiff's most recent record said she weighed 145 and she testified that she weighed 140 -- plaintiff said she had lost weight lately because she had been "real upset" (Tr. at 63).

A couple years earlier, plaintiff was bitten by a tick (Tr. at 67). She was in the hospital and her organs were shutting down (Tr. at 67). She was dying and the doctors finally diagnosed her with ehrlichiosis,[16] which is very rare (Tr. at 67). Ever since then her headaches and fibromyalgia have been worse (Tr. at 67). She is now being tested for Lyme disease (Tr. at 67).

## 2. Vocational expert testimony.

Vocational expert Amy Salva testified at the request of the Administrative Law Judge. The first hypothetical involved a person who could do light work, lifting and carrying up to 20

---

[16]Caused by tick bites, the condition is treated with antibiotics for three weeks.

pounds occasionally and ten pounds frequently; could stand and walk for six hours; could sit for six hours; would have an unlimited ability to push and pull; could not use ladders or scaffolding; could occasionally climb stairs, balance, stoop, kneel, crouch, and crawl; should avoid concentrated exposure to heat, cold, fumes, and odors; and would need to be limited to simple work of SVP 3 or less (Tr. at 70). The vocational expert testified that such a person could not do any of plaintiff's past relevant work; however, the person could work as a retail marker, D.O.T. 209.587-034, with 2,300 in Kansas City, 5,400 in Missouri, and 260,000 in the nation (Tr. at 70-71). The person could also work as an office helper, D.O.T. 239.567-010, with 2,100 in Kansas City, 5,100 in Missouri, and 140,000 in the country (Tr. at 71). The person could work as a collating machine operator, D.O.T. 208.685-010, with 500 positions in Kansas City, 2,000 in Missouri, and 70,000 in the nation (Tr. at 71).

The second hypothetical involved a person with all the limitations in the first hypothetical but who would not be able to do more than sedentary work, could not lift more than ten pounds and could not stand or walk for more than two hours per day (Tr. at 71-72). The vocational expert testified that such a person could work as an optical goods assembler, D.O.T. code 713.687-018, with 750 in Kansas City, 1,100 in Missouri, and 68,000 in the nation (Tr. at 72). The person could also work as a circuit board assembler, D.O.T. 726.685-110, with 2,100 in Kansas City, 5,000 in Missouri, and 350,000 in the country (Tr. at 72). The person could work as a document scanner, D.O.T. 249.587-018, with 700 in Kansas City, 2,000 in Missouri, and 145,000 in the country (Tr. at 72),.

The third hypothetical involved a person with all the limitations as in the second hypothetical but who could only occasionally finger and handle (Tr. at 72). The vocational expert testified that such a person could not work (Tr. at 73).

22

The next hypothetical incorporated the limitations set out by Dr. Davuluri (Tr. at 244-249) which include the need to take unscheduled breaks to lie down several times a month for several days at a time, the inability to perform even low-stress jobs, and the need to miss work more than four days per month as a result of her impairments or treatment (Tr. at 73-74). The vocational expert testified that such a person could not work (Tr. at 74).

## V.  *FINDINGS OF THE ALJ*

Administrative Law Judge Guy Taylor entered his opinion on January 22, 2010 (Tr. at 15-28). The ALJ found that plaintiff meets the insured status requirements of the Social Security Act through June 30, 2013 (Tr. at 17).

Step one. Plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 17). Plaintiff's earnings record shows that she worked after her alleged onset date; however, "giving the claimant the benefit of the doubt," the ALJ determined that this work "arguably qualifies as a series of two unsuccessful work attempts." The ALJ noted that after plaintiff's alleged onset date, she applied for and received $2,310 in unemployment benefits during the fourth quarter of 2007 and $654 during the first quarter of 2008. "In order to receive unemployment benefits the claimant had to certify that she was ready, willing and able to work, which is inconsistent with her testimony that she was not able to work during the periods of time she received unemployment benefits." (Tr. at 17).

Step two. Plaintiff has the following severe impairments: degenerative joint disease of the right knee, fibromyalgia, migraine headaches, and bipolar disorder/depression (Tr. at 18). He found that the following impairments are not medically determinable: Raynaud's phenomenon/ syndrome, disease from a tick bite, and hypotension (Tr. at 18).

Step three. Plaintiff's severe impairments do not meet or equal a listed impairment (Tr. at 18). The ALJ found that plaintiff has mild restriction in activities of daily living; moderate

restriction in social functioning; moderate difficulties with concentration, persistence and pace; and has no episodes of decompensation (Tr. at 19).

Step four. Plaintiff retains the residual functional capacity to perform sedentary work but with no use of ladders or scaffolds; she may only occasionally climb stairs, balance, stoop, kneel, crouch or crawl; she must avoid concentrated exposure to heat, cold, fumes and odors; and she is limited to simple work with an SVP of 3 or less (Tr. at 19). With this residual functional capacity, plaintiff cannot return to her past relevant work (Tr. at 27).

Step five. Plaintiff can adjust to other work in significant numbers in the national and regional economy, such as optical goods assembler, circuit board assembler, and document scanner (Tr. at 28).

## VI. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the

Case 5:11-cv-06029-REL   Document 12   Filed 02/14/12   Page 24 of 31

basis of objective medical evidence or personal observations by the ALJ. In determining

credibility, consideration must be given to all relevant factors, including plaintiff's prior work

record and observations by third parties and treating and examining physicians relating to

such matters as plaintiff's daily activities; the duration, frequency, and intensity of the

symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of

medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir.

1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the

Polaski opinion, and additionally states that the following factors should be considered:

Treatment, other than medication, the individual receives or has received for relief of pain or

other symptoms; and any measures other than treatment the individual uses or has used to

relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20

minutes every hour, or sleeping on a board).

 The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of

disability are as follows:

> The claimant's allegations are only partially credible in this case. Her testimony
> concerning the frequency, extent and duration of her migraine headaches is not
> supported by her medical treatment records in evidence. An MRI scan of her brain was
> normal. The only neurologist to have examined her, Dr. Davuluri, noted that her
> headaches appeared to be a combination of migraines and rebound headaches caused
> by using an over-the-counter analgesic pain reliever (Excedrin migraine tablets). The
> treatment notes from her primary care physician, Dr. Berkowitz. frequently make no
> mention of any complaints of headaches by the claimant, although the evidence shows
> that the claimant has been prescribed medication (Topamax, Imitrex and/or Treximet)
> at all times pertinent to this adjudication. As for her fibromyalgia, both her treating
> rheumatologist (Dr. Huston) and the arthritis specialist who examined her (Dr. Daud)
> indicate that she has been on "good treatment for fibromyalgia." Dr. Daud noted that
> despite the claimant's fibromyalgia she has full range of motion in all her joints and
> that her muscle strength was normal. The evidence does not show that the claimant
> has been in full compliance with the medical treatment plan formulated by her various
> physicians with regard to a continuing exercise program, which has an adverse effect
> on her credibility in this case. The undersigned finds that the claimant's testimony
> regarding the severity of her pain is either exaggerated or embellished, and is not
> supported by her medical treatment records. If the claimant were truly in as much pain

as she alleges, she would require frequent hospital visits just to get her extreme pain under control.  This has not happened.

The fact that the claimant applied for and accepted unemployment benefits during the period being adjudicated also has an adverse effect on her credibility since she had to certify that she was able to work in order to receive unemployment benefits.  There is also evidence in the record that the claimant was laid off from her long time job at Commerce Bank, which is inconsistent with her claim that she had to quit because of her medical impairments. (Dr. Huston noted that the claimant told him on August 13, 2007, that "she was laid off from her job as a banker recently.")

(Tr. at 25-26).

Here, the ALJ properly considered inconsistencies between plaintiff's subjective allegations and the objective medical evidence.  See 20 C.F.R. §§ 404.1529(c)(2) and 416.929(c)(2); Social Security Ruling (SSR) 96-7p.  Plaintiff testified to concentration and memory problems; she testified that she had "bad days" during which she stayed in bed due to depression.  However, mental status examinations did not indicate concentration or memory problems, and a treatment note from November 2008 indicated a normal mental status examination and stable mood.  Plaintiff's mood was also normal in April 2009.

Although plaintiff's right knee had "significant bony crepitus," x-rays and an MRI were normal.  At the hearing, plaintiff described severe fibromyalgia pain, numbness, joint stiffness, and a near total impairment in activities of daily living.  Yet, physical examinations consistently indicated good strength and range of motion and no edema or other changes in her upper or lower extremities.  Indeed, in December 2008 and September 2009, while seeking treatment for other complaints, plaintiff reported no pain (Tr. at 296-297, 404).  Plaintiff did not have treatment by a specialist for headaches until June 2009 when she saw neurologist Dr. Davuluri.  He treated her only twice, and both examinations and an MRI were normal.  Dr. Davuluri noted no functional impairment in plaintiff's activities of daily living.

On one occasion when plaintiff saw Dr. Berkowitz, she reported pain at a nine or ten out of ten (Tr. at 292-293). Despite this description of unbearable pain, plaintiff's physical examination was normal, with no inflammation, swelling, or tenderness involving plaintiff's ankles, calves, knees, thighs, fingers, or wrists, although she had "some minimal, if at all, tenderness" in her arms. Plaintiff complained of pain rated a ten out of ten when she saw Dr. Daud -- he in turn recommended water therapy, weight loss, and exercise.

Plaintiff argues that the ALJ failed to consider her "persistent efforts to obtain relief" in his credibility analysis. Yet, the ALJ's decision contains a thorough discussion of the medical evidence regarding plaintiff's treatment history. Plaintiff also argues that the ALJ misinterpreted a conclusion by Dr. Daud that she had "good treatment for fibromyalgia" to mean "good results from fibromyalgia treatment" rather than "proper treatment." Yet, this reading is consistent with the relatively mild findings reported in Dr. Daud's treatment note and other evidence of record, including Dr. Berkowitz's note in August 2007 that plaintiff's fibromyalgia was "doing well" with medication.

The federal regulations state that although an ALJ may not reject a claimant's subjective complaints based solely on the objective medical evidence, such evidence is a useful indicator in making conclusions about the effect of symptoms, such as pain, on the claimant's ability to work. See 20 C.F.R. §§ 404.1529(c) and 416.929(c). Moreover, Eighth Circuit case law holds that the absence of an objective medical basis to support the degree of a claimant's subjective complaints is an important factor in evaluating the credibility of her testimony and complaints. Ramirez v.Barnhart, 292 F.3d 576, 581 (8th Cir. 2002); Russell v. Sullivan, 950 F.2d 542, 545 (8th Cir. 1991).

The ALJ also cited plaintiff's course of treatment, finding that her allegations of severe pain (plaintiff testified that even after having taken her medication, on a scale of one to ten

with ten being pain she cannot endure, her arms were a nine during the hearing, her feet were
an eight, her knee was a nine, and her head was a seven -- which she characterized as typical
daily pain) were inconsistent with a lack of aggressive treatment and hospitalizations. Plaintiff
sought emergency room treatment for headaches only twice during the relevant period, in June
2009 and January 2010, and also sought emergency treatment for a headache on March 15
and 16, 2010. Plaintiff did not seek treatment with a pain management specialist (Tr. 250-
441). Instead, her providers recommended medication and exercise. See Dukes v. Barnhart,
436 F.3d 923, 928 (8th Cir. 2006) (upholding ALJ's credibility finding where he relied on
plaintiff's limited treatment). Contrary to plaintiff's argument, the ALJ properly found that her
relatively conservative treatment methods were inconsistent with her subjective claims of
severe pain, almost more than she could endure, on a daily basis.

　　　　Plaintiff was noncompliant with recommendations that she exercise. Drs. Berkowitz,
Huston, and Daud recommended exercise for fibromyalgia pain relief. Plaintiff testified that
she did water exercise and it helped, but she quit due to headaches.[17] She was also told to stop
taking over-the-counter headache medicine which her doctor believed was causing rebound
headaches; however, by her next appointment she was still taking them. "A failure to follow a
recommended course of treatment also weighs against a claimant's credibility." Guilliams v.
Barnhart, 393 F.3d 798, 802 (8th Cir. 2005) (citing Gowell v.Apfel, 242 F.3d 793, 797 (8th
Cir.2001)).

　　　　Plaintiff testified that she quit working due to her impairments, but the ALJ noted
evidence that she had been laid off. The fact that a claimant leaves a job for reasons other than

---

[17]Plaintiff argues that the ALJ did not indicate whether he considered plaintiff's testimony
that she did not exercise because of headaches, yet the ALJ specifically noted this testimony in
his decision.

28

her medical condition is a proper consideration in assessing credibility. <u>Medhaug v.Astrue</u>, 578 F.3d 805, 816-17 (8th Cir. 2009). Moreover, the ALJ noted that plaintiff collected unemployment benefits in the fourth quarter of 2007 and first quarter of 2008, despite alleging disability during this time. A claimant who applies for unemployment compensation benefits holds herself out as available, willing, and able to work. <u>Black v. Apfel</u>,143 F.3d 383, 387 (8th Cir. 1998); <u>Johnson v. Chater</u>, 108 F.3d 178, 180 (8th Cir. 1997).

The ALJ articulated the inconsistencies upon which he relied in discrediting plaintiff's allegations regarding the extent of her limitations. This finding is supported by substantial evidence in the record as a whole. Therefore, plaintiff's motion for judgment on this basis will be denied.

## VII. OPINION OF DR. DAVULURI

In her credibility argument, plaintiff suggested that the ALJ improperly weighed the medical opinion of Dr. Davuluri who, in a Headaches Residual Functional Capacity Questionnnaire, stated that plaintiff's prognosis was poor, she would generally be precluded from performing basic work activities, and she would need unscheduled breaks several times per month, lasting up to several days.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. <u>Reed v. Barnhart</u>, 399 F.3d 917, 920 (8th Cir. 2005); <u>Ellis v. Barnhart</u>, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give the opinion: (1) the length of the treatment relationship, (2) frequency of examinations, (3) nature and extent of the treatment relationship, (4) supportability by medical signs and laboratory findings, (5) consistency of the

29

opinion with the record as a whole, and (6) specialization of the doctor. 20 C.F.R. §
404.1527(d)(2) - (5).

The ALJ had this to say about Dr. Davuluri's opinion:

On July 28, 2009, Dr. Davuluri completed a form entitled "Headaches Residual
Functional Capacity Questionnaire". The undersigned gives the opinions set forth in
this form little weight because they too are based on the subjective reports that the
claimant stated to Dr. Davuluri and not based on any objective medical findings. In
addition, as noted above, Dr. Davuluri saw the claimant on only two occasions (June 2,
2009 and July 28, 2009) upon referral by Dr. Berkowitz, the claimant's primary care
physician.

(Tr. at 26-27).

Dr. Davuluri treated plaintiff only two times prior to giving his opinion. The Eighth

Circuit has held that such a short treatment relationship does not warrant controlling weight

because it does not provide a longitudinal picture of a claimant's impairments. See Randolph

v. Barnhart, 386 F.3d 835, 840 (8th Cir. 2004) ("Vega's March letter . . . is not entitled to

controlling weight as a medical opinion of a treating source. When she filled out the checklist,

Vega had only met with Randolph on three prior occasions.") (citation omitted); 20 C.F.R. §§

404.1527(d)(2)and 416.927(d)(2).

Moreover, Dr. Davuluri's opinion was not well-supported by medically acceptable

clinical and laboratory diagnostic techniques. Dr. Davuluri stated that plaintiff's prognosis

was poor, she would be precluded from performing even basic work activities when she had

headaches, she would require unscheduled breaks to lie down several times per month, she

would be absent more than four times per month due to her condition or treatment, and she

was incapable of even low stress jobs. However, treatment notes from plaintiff's two visits with

Dr. Davuluri indicate no objective findings to support these extreme limitations. Examinations

on both occasions were unremarkable. Consequently, it appears that Dr. Davuluri's opinions

were based on plaintiff's subjective reports, rather than objective medical evidence. See Kirby

30

v. Astrue, 500 F.3d 705, 709 (8th Cir. 2007) ("The ALJ was entitled to give less weight to Dr. Harry's opinion, because it was based largely on Kirby's subjective complaints rather than on objective medical evidence."). Dr. Davuluri's treatment notes do not support the functional restrictions indicated in the RFC form.

## VIII.  CONCLUSIONS

Based on all of the above, I conclude that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
February 14, 2012